UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

William E. Burdick, Sr.,

       Plaintiff,

       v.                                       Civil Action No. 2:13-cv-186

Commissioner of Social Security,

       Defendant.

## REPORT AND RECOMMENDATION
(Docs. 13, 18)

       Plaintiff William E. Burdick, Sr., brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI"). Pending before the Court are Burdick's motion to reverse the Commissioner's decision (Doc. 13), and the Commissioner's motion to affirm the same (Doc. 18). For the reasons stated below, I recommend that Burdick's motion be GRANTED, the Commissioner's motion be DENIED, and the matter be REMANDED for further proceedings and a new decision.

## Background

       Burdick was 43 years old on his alleged disability onset date of June 7, 2007. He had a difficult time in school due to learning disabilities and behavioral problems, dropping out in the ninth grade after skipping two grades. He has experience working as

a construction worker, a warehouse worker, and an assembly line worker.  He also served as a handyman at an inn in exchange for a place to stay, which involved cleaning rooms, changing electrical boxes, doing minor maintenance work, answering phones, collecting rent, and doing other odd jobs.  (AR 181, 346, 349.)

Burdick is divorced and has three adult children and one non-custodial child who was approximately 10 years old on the alleged disability onset date.  He is largely estranged from his family, and has no friends.  (AR 289.)  Yet his mother, one of his sisters, and his adult daughter and son-in-law sometimes help support him financially and otherwise.  (AR 278, 289, 345–48.)  During the alleged disability period, his living arrangements varied: he lived with his daughter and her family, rented a room from a friend, and stayed at the inn where he worked in exchange for paying rent.  (AR 51, 278, 348.)  He was incarcerated in 2007 for domestic violence, and then again in 2009 due to a positive urinalysis drug test while on probation.  (AR 289, 347.)

Starting at age 17, Burdick has had back pain.  When he was 18, he was hit in the head with a wood lathe at work.  (AR 346.)  At around age 20, he tore his rotator cuff while working.  (*Id.*; AR 43.)  Due to back pain, Burdick claims he cannot sit for more than 10–15 minutes at a time and cannot walk long distances.  (AR 39, 41.)  He also claims to have difficulty lifting and reaching due to shoulder pain.  (AR 43, 48.)  He takes naps during the day because pain disrupts his nighttime sleep.  (AR 45–46.)  In addition to his physical impairments, Burdick also suffers from anxiety and depression.  (AR 290.)  He has been diagnosed with adjustment disorder with mixed anxiety and depressed mood, chronic attention deficit/hyperactivity disorder, personality disorder with paranoid

and antisocial features, and borderline intellectual functioning.  (AR 291.)  On a typical

day, he sits at home watching television and playing cards or other games with visitors

including his daughter, and goes to medical and other appointments.  (AR 31–32, 38.)

In October 2010, Burdick filed an application for SSI, alleging that, as of

July 15, 2005, he could not work due to a learning disability, illiteracy, back and neck

pain, leg numbness, shoulder pain caused by a torn rotator cuff, asthma, hand pain and

numbness, knee pain, poor eyesight, and arthritis.  (AR 159–67, 197, 201.)  Burdick's

application was denied initially and upon reconsideration, and he timely requested an

administrative hearing.  The hearing was conducted on February 6, 2012 by

Administrative Law Judge ("ALJ") Thomas Merrill.  (AR 25–67.)  Burdick testified, and

was represented by an attorney.  A vocational expert ("VE") also testified.  At the

hearing, Burdick amended his alleged disability onset date to June 7, 2007.  (AR 28.)  On

March 26, 2012, the ALJ issued a decision finding that Burdick was not disabled under

the Social Security Act since October 11, 2010, the date his SSI application was filed.

(AR 8–19.)  Thereafter, the Appeals Council denied Burdick's request for review,

rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having

exhausted his administrative remedies, Burdick filed the Complaint in this action on

June 27, 2013.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

3

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

4

Employing this sequential analysis, ALJ Merrill first determined that Burdick had not engaged in substantial gainful activity since October 11, 2010, the application date. (AR 10.)  At step two, the ALJ found that Burdick had the following severe impairments: minimal degenerative disc disease of the lumbar spine, learning disability, and an affective disorder.  (*Id.*)  Conversely, the ALJ found that Burdick's emphysema, vision problems, rotator cuff injury, wrist pain, and carpal tunnel syndrome were all non-severe impairments; and that Burdick's leg/arm/hand trembling was not a medically determinable impairment.  (AR 10–11.)  At step three, the ALJ found that none of Burdick's impairments, alone or in combination, met or medically equaled a listed impairment, including Listing 1.04 for spine disorders, Listing 12.04B for affective disorders, and Listing 12.02 for learning disorders.  (AR 11–12.)

Next, the ALJ determined that Burdick had the RFC to perform "work in the light exertional range," as defined in 20 C.F.R. § 416.967(b), with the following exceptions: "[H]e can understand, remember[,] and carry out 1–3 step tasks; may need extra hands-on demonstration but not outside the tolerance of a competitive work setting; and has sufficient concentration, persistence[,] and pace to sustain work activities for two[-]hour blocks of time throughout a normal work day and work week."  (AR 13.)  Given this RFC, the ALJ found that Burdick was unable to perform any past relevant work.  (AR 17.)  Based on the VE's testimony, however, the ALJ found that Burdick could perform other jobs existing in significant numbers in the national economy, including the jobs of cleaner, cafeteria attendant, and laundry worker.  (AR 17–18.)  The ALJ concluded that Burdick had not been disabled since the date his application was filed.  (AR 18.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Burdick claims the ALJ's step-two finding that his shoulder impairment was not severe is not supported by substantial evidence.  He further claims the ALJ erred by failing to evaluate his claim under the listing for mental retardation.  Finally, Burdick contends the ALJ failed to give enough weight to the opinions of treating nurse practitioner ("NP") Melissa Rowe.  The Commissioner disagrees with each of these claims, asserting that the ALJ's decision complies with the applicable legal standards and is supported by substantial evidence.

**I.    Listing 12.05(C)**

Burdick contends the ALJ should have evaluated his impairments under Listing 12.05(C), the listing for intellectual disability, which states as follows:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> . . .

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.  Therefore, for Burdick to meet the requirements of Listing 12.05(C), he must demonstrate that he has a valid IQ score of 60 through 70; he has a physical or other mental impairment imposing additional and significant work-related limitations of function; and he has deficits in adaptive functioning initially manifested before the age of 22.  *See Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003); *Bailey v. Apfel*, 230 F.3d 1063, 1065 (8th Cir. 2000).

The ALJ did not consider whether Burdick met Listing 12.05(C).  Nonetheless, the record shows that Burdick had three IQ scores within the range of 60–70.  Consulting examiner Dr. Dennis Reichardt stated in a Psychological Report that Burdick had a full scale IQ of 69, placing him in the "Extremely Low range of mental abilities," and a verbal IQ score of 65.  (AR 290.)  Consulting examiner Dr. Katherine Baum stated in a Neuropsychological Evaluation that Burdick had a verbal comprehension IQ score of 70, falling in the "borderline range."  (AR 319.)  There is nothing in the record to indicate that these IQ scores were not valid, and the ALJ did not discredit them in his decision. The Commissioner argues that the ALJ was not required to consider the IQ score of 69 because it was part of the record on Burdick's prior claim which was denied and not appealed.  (Doc. 18-1 at 15.)  But the Commissioner cites no Second Circuit authority supporting this argument, and the cases upon which the Commissioner relies are factually distinguishable.  (*See id.* (citing *Partin v. Colvin*, 2013 WL 5468498, at *3 (E.D. Ky. Sept. 30, 2013); *Prescott v. Astrue*, 2009 WL 3148731, at *4-5 (D. Me. Sept. 30, 2009)).)

Moreover, multiple consulting physicians and other providers opined that Burdick had deficits in adaptive functioning during the relevant period.[1]  For example, Dr. Baum opined as follows: "Burdick will struggle in an employment position that requires basic academic skills, average processing speed, good immediate memory, adequate concentration skills and good problem-solving skills.  [He] would perform best in a situation where he can work at his own pace, where there is supportive supervision and instruction as well as review of tasks to learn."  (AR 319.)  Likewise, vocational counselor Sue Zamecnik opined that Burdick was "very unlikely to be able to pursue full[-]time work" due in part to his "low cognitive functioning."  (AR 342.)  Zamecnik stated that Burdick had only a first grade reading level and thus had difficulty with written or spoken instructions and needed an advocate to assist him in obtaining housing and employment.  (AR 351.)  She concluded that, in addition to typical vocational counseling/guidance and placement, Burdick likely required training, physical health services, substantial counseling/guidance, and specialized placement (e.g., a job coach) before he could "reach an employment outcome."  (AR 352.)

Regarding Listing 12.05(C)'s requirement of "a physical or other mental impairment imposing an additional and significant work-related limitation of function,"

---

[1]  The Second Circuit recently explained that "adaptive functioning" refers to an individual's "[]ability to cope with the challenges of ordinary everyday life," and that "if one is able to satisfactorily navigate activities such as liv[ing] on [one's] own, tak[ing] care of . . . children . . . without help . . ., pay[ing] bills, and avoid[ing] eviction, one does not suffer from deficits in adaptive functioning." *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (quotation marks and citations omitted).  Here, the record demonstrates that, while Burdick has been able to live on his own at times, he does not care for anyone else and he depends on his adult daughter, his son-in-law, his sister, and his mother to help with meals, household chores, and food shopping.  (*See, e.g.*, AR 42, 44, 183–84, 189–92, 278, 289, 345–48.) Also noteworthy, agency "Report Completer" Robert Anderson, who helped Burdick complete agency forms, stated as follows: "[Burdick] has very poor hygiene, and poor dental health.  His clothing and shoes are very soiled and he appears unwashed for a prolonged period of time."  (AR 220.)

the standard is the same as that used at step two of the sequential evaluation to determine whether an impairment is "severe."  *See MacMillan v. Astrue*, No. 07–CV–0959 (LEK), 2009 WL 8595781, at *6 (N.D.N.Y. Nov. 17, 2009); *Baneky v. Apfel*, 997 F. Supp. 543, 546 (S.D.N.Y. 1998) ("This Court holds that the correct standard for determining whether an 'additional' impairment imposes a 'significant' work-related limitation under [Listing] 12.05(C) is the severity test [set forth at step two of the Commissioner's five-step process].").  Thus, given the ALJ's finding that Burdick has the severe impairments of degenerative disc disease of the lumbar spine and affective disorder (AR 10), Burdick easily meets this requirement.

Burdick has also met Listing 12.05(C)'s requirement that his intellectual disability initially manifested before age 22.  Courts have found circumstantial evidence—such as evidence that a claimant attended special education classes; dropped out of school before graduation; or had difficulties in reading, writing, or math—sufficient to infer deficits in adaptive functioning prior to age 22.  *MacMillan*, 2009 WL 8595781, at *5.  Here, the record shows that Burdick repeated kindergarten, second grade, and fifth grade; and received special education services beginning in elementary school.  (AR 33–34, 314, 347.)  During the seventh or eighth grade, he was moved to the ninth grade due to conflicts with the school principal and altercations with other students.  (*Id.*)  He did not finish the ninth grade, leaving school when he was 16 years old and not obtaining a GED thereafter.  (AR 34–35, 314.)  He is unable to read or write a sentence.  (AR 290.)  Dr. Reichardt noted after examining Burdick that he "has practically no academic skills." (*Id.*)  This evidence clearly demonstrates that Burdick's intellectual disability manifested

before age 22.  The Commissioner argues that Burdick should have submitted school records to support his allegations regarding problems in school.  (Doc. 18-1 at 18.)  But the ALJ did not make that point in his decision, and the decision does not indicate that the ALJ doubted Burdick's allegations about his schooling.  Rather, the ALJ explicitly accounted for Burdick's problematic and incomplete "educational background" by limiting him to "unskilled work."  (AR 17.)

Given Burdick's IQ scores, as well as evidence demonstrating that he has had deficits in adaptive functioning which manifested before age 22 and the ALJ's findings that Burdick's back impairment and affective disorder were severe at step two, I find that the ALJ should have considered whether Burdick's mental impairment met or medically equaled Listing 12.05(C).  The Commissioner argues that the agency consultants implicitly or explicitly considered whether Burdick met the criteria of Listing 12.05(C) and properly found that he did not.  (Doc. 18-1 at 15–16.)  But it is the responsibility of the ALJ—not the consulting examiners—to determine whether a claimant has met or medically equaled a particular listing.  Here, the ALJ did not even consider Listing 12.05(C).  The Commissioner may not substitute her own rationale when an ALJ fails to provide one.  *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("A reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency action.") (internal quotation marks omitted).

## II.    Severity of Shoulder Impairment

Burdick also claims the ALJ erred in finding that his shoulder impairment was not severe.  The claimant bears the burden at step two of the sequential process to establish

11

that his or her impairment is "severe," meaning it "significantly limit[s] [his or her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see* 20 C.F.R. § 404.1520(c). Despite this strong language, the step-two severity assessment "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)). To that end, Social Security Ruling ("SSR") 85-28 provides: "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., *do not have more than a minimal effect on the [claimant's] physical or mental ability(ies) to perform basic work activities*." SSR 85-28, 1985 WL 56856, at *3 (1985) (emphasis added). The Ruling further states: "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at this step when medical evidence establishes *only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work*." *Id.* (emphasis added) (citing 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), 416.921); *see also* SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996).

The ALJ found that Burdick's shoulder condition is "not a severe impairment" based on the following grounds: (1) Burdick never had surgery on his shoulder; (2) Burdick worked in heavy construction jobs with the condition; and (3) there is no objective testing verifying a rotator cuff tear. (AR 11.) Although the record may support

these findings[2], they do not preclude a finding of a severe shoulder impairment; and

substantial evidence demonstrates that Burdick's shoulder impairment was in fact severe.

First, examining consultant Dr. Eric Seyferth found that Burdick's left shoulder showed

"crepitus and pain with more than 90 degrees abduction limited to 120 abduction by

resistance" (AR 278), and concluded that Burdick "has evidence of probable

impingement syndrome in the left shoulder" (AR 279).  The Commissioner argues that

these statements do not demonstrate that Burdick's shoulder impairment was severe

because they are based merely on Burdick's reporting of pain, and the regulations require

that symptoms of pain are insufficient to demonstrate a severe impairment unless

accompanied by "medical signs or laboratory findings show[ing] that a medically

determinable impairment(s) is present."  20 C.F.R. § 404.1529(b).  (*See* Doc. 18-1 at 11–

12.)  But in fact, Dr. Seyferth's finding of "crepitus and pain with more than 90 degrees

abduction limited to 120 abduction by resistance" (AR 278) constitutes a "medical sign"

which the ALJ should have considered at step two.[3]  Similarly, Dr. Gregory King stated

in a treatment note that forward flexion, extension, abduction, and adduction range of

motion in the left shoulder was painful and that Burdick's rotator cuff had a "positive

Painful Arc."  (AR 393.)  Dr. King concluded that Burdick had a complete tear of the left

---

[2]  Burdick claims the ALJ "misquoted" the record when he stated that Dr. King noted he had
reviewed the files of Dr. Kratzer who recommended surgery "but [Burdick] declined such surgery for the
1986 left shoulder injury."  (AR 11 (citing AR 331).)  Burdick identifies no error here.  The cited record
states: "Left shoulder injury in 1986, rotator cuff tear, surgery recommended, but patient declined when
told about risks vs. benefits odds."  (AR 331.)  The record supports the ALJ's statement that Burdick
"never had surgery" to address his shoulder condition and that Dr. King "noted that . . . Dr. Kratzer . . .
recommended surgery but [Burdick] declined."  (AR 11; *see* AR 331.)

[3]  The regulations define "medical signs" as "anatomical, physiological, or psychological
abnormalities which can be observed, apart from your statements (symptoms).  Signs must be shown by
medically acceptable clinical diagnostic techniques."  20 C.F.R. § 404.1528(b).

rotator cuff tendon.  (*Id.*)  The ALJ also should have considered this evidence in determining whether Burdick's shoulder impairment was severe.

Agreeing with the examination findings of Drs. Seyferth and King, NP Rowe recorded that Burdick had pain and tenderness in the left shoulder; pain on rotation of the shoulder; and positive "Drop Arm test," "Empty Can test," and "Lift Off test."  (AR 385.) Presumably based on these examination findings, Rowe opined that Burdick was able to lift and carry only up to 10 pounds and only on an occasional basis, and could never reach overhead or in any direction with his left hand.  (AR 415, 417.)  Rowe specified that Burdick's inability to reach with his left hand was due to a "[t]orn rotator cuff [in his left] shoulder."  (AR 417.)  Although the ALJ gave "little weight" to Rowe's opinions (AR 16), as explained below, he did not provide good reasons for that decision, and the ALJ should have considered these opinions in assessing the severity of Burdick's shoulder impairment.

The ALJ based his decision that Burdick's shoulder impairment was not severe in part on his finding that Burdick "has worked in heavy construction jobs with the condition."  (AR 11.)  This finding is not supported by substantial evidence.  Rather, the record demonstrates that Burdick has worked only sporadically, making very low earnings and no earnings at all since 2007.  (AR 175–76.)  For example, Burdick testified at the administrative hearing that, while incarcerated, he washed dishes for one hour each day, taking breaks as needed.  (AR 47–48.)  Regarding his job at the inn, Burdick stated that it entailed doing "li[ght] work . . . in exchange for rent."  (AR 181.)  Vocational counselor Zamecnik recorded that the job required Burdick to answer phones, make

reservations, collect rent (AR 349), and "help[] take care of odd jobs" and do routine maintenance (AR 342; *see* AR 349).  Zamecnik opined that, despite his ability to do this job at the inn, Burdick was "very unlikely to be able to pursue full[-]time work due to his physical limitations [and] low cognitive functioning," demonstrating that she did not believe Burdick's job at the inn was equivalent to full-time work.  (AR 342.)

In sum, there is sufficient evidence demonstrating that Burdick's shoulder impairment was "severe," i.e., had "more than a minimal effect on [Burdick's] . . . ability . . . to perform basic work activities."  SSR 85-28, 1985 WL 56856, at *3.  Given my recommendation that the claim should be remanded for an analysis of whether Burdick meets Listing 12.05(C), I further recommend that, on remand, the ALJ should reconsider Burdick's shoulder impairment at step two and at later steps of the sequential analysis, including determining Burdick's RFC.

### III.   Nurse Practitioner Rowe's Opinions

Finally, Burdick claims the ALJ erred in his analysis of NP Rowe's opinions. Rowe began treating Burdick in October 2010.  (AR 387–88.)  In December 2010, after examining Burdick, she found that he suffered from lumbar disc degeneration, lumbar facet syndrome, chronic pain syndrome, and left rotator cuff tear, among other conditions, and prescribed cyclobenzaprine, methylprednisolone, and the narcotic pain reliever tramadol.  (AR 385–86.)  Rowe saw Burdick again in April, August, and November of 2011, recording notes at each visit.  (*See* AR 382–83, 401–02, 404–05, 421–22.)  In November 2011, Rowe completed Interrogatories wherein she opined that Burdick's degenerative disc disease met the criteria of Listing 1.04(C), the listing for

spinal disorders.  (AR 411.)  In the same month, Rowe completed a Medical Source

Statement of Ability to Do Work-Related Activities (Physical) wherein she opined that

Burdick needed to alternate sitting, standing, and walking; could never reach with his left

hand due to a torn rotator cuff; and was significantly limited in his ability to perform

postural activities due to lumbar disc degeneration.  (AR 416–18.)  Rowe also noted that

Burdick is illiterate, which she opined would affect his ability to do work-related

activities.  (AR 419–20.)

The ALJ gave no weight to Rowe's opinion that Burdick's degenerative disc

disease met Listing 1.04(C).  Burdick does not argue that he has met the criteria of this

Listing, and I find that the evidence would not support such a finding.  Particularly, there

are no "findings on appropriate medically acceptable imaging, manifested by chronic

nonradicular pain and weakness, and resulting in inability to ambulate effectively," as

required by Listing 1.04(C).  20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04.  Therefore, the

ALJ did not err in giving no weight to Rowe's opinion on this issue.

On the other hand, I find that the ALJ did err in his analysis of Rowe's opinions

regarding Burdick's limitations in sitting, standing, walking, reaching, and postural

activities.  The ALJ gave "limited weight" to these opinions on the following grounds:

(1) Rowe is not an "accepted medical source"; (2) the form Rowe completed was initially

addressed to two physicians in her practice who did not complete it; (3) Rowe stated that

Burdick was a patient of her practice for eight years when in fact the record demonstrates

that he was a patient there for only approximately six years; (4) on two occasions, Rowe

recorded that Burdick had completely normal musculoskeletal and psychiatric findings,

and she made no findings of lumbar spinal stenosis resulting in pseudoclaudication (intermittent limping) or findings on appropriate medically acceptable imaging; and (5) Rowe saw Burdick only five times, and three of those times were "to assist him in filling out paperwork for state assistance." (AR 16.)

The ALJ accurately stated that Rowe, a nurse practitioner, is not an "acceptable medical source." 20 C.F.R. § 404.1513(a), (d)(1). Therefore, the ALJ could not afford "controlling weight" to Rowe's opinions. 20 C.F.R. § 404.1527(c)(2). Nonetheless, the ALJ was required to provide a reasonable explanation for his decision to afford limited weight to these opinions. *See, e.g.*, *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010). SSR 06-03p states that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources," including nurse practitioners, to show the severity of a claimant's impairments and how they affect his or her ability to function. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). The Ruling further states that medical sources like nurse practitioners "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at *3. Thus, opinions from these sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* SSR 06-03p directs ALJs to apply the following factors in evaluating opinion evidence from "other sources," including nurse practitioners: (1) whether the source is a specialist or an expert in the area related to the claimant's impairment; (2) how long the source has known and how frequently the source has seen the claimant; (3) whether the source

explains and presents relevant evidence to support her opinion; (4) how consistent the source's opinion is with other evidence; and (5) any other factors tending to support or refute the opinion. *Id.* at *4–5.

The ALJ should have considered two key factors in assessing Rowe's opinions: first, Rowe had a treating relationship with Burdick, unlike non-examining agency consultants Drs. Leslie Abramson and Ann Fingar, whose opinions the ALJ gave "great weight" (AR 15–16); and second, Rowe's opinions are supported by her own treatment notes and consistent with the record as a whole.  Specifically, Rowe's opinions regarding Burdick's physical limitations are consistent with the examination findings of Drs. Seyferth and King (discussed above), who recorded that forward flexion, extension, abduction, and adduction range of motion in the left shoulder was painful; that Burdick's rotator cuff had a "positive Painful Arc"; and that Burdick had a complete tear of the left rotator cuff tendon.  (AR 278–79, 393.)  Dr. Seyferth further noted, in accord with Rowe's opinions, that Burdick's symptoms were "significant" and "chronic."  (AR 279.) Rowe's opinions are also consistent with vocational counselor Zamecnik's opinion that Burdick's physical limitations would limit his ability to pursue full-time work.  (342.) Rowe's opinions are also consistent with the following medical records:  Dr. Paul Vinsel's treatment notes documenting tenderness in the lumbar region and pain on straight leg raise (AR 273);  J. Dowling, R.N.'s treatment notes stating that Burdick exhibited a "spastic gait" and lumbar tenderness (AR 396);  Dr. Dennis Reichardt's notation that Burdick walked with a "pronounced limp" (AR 288); and Dr. Therese Dranginis's treatment notes recording abnormal gait and station, stooping and limping on

18

the right, abnormal spinal alignment, bilateral muscle spasms in the lumbar spine, restricted and painful flexion and extension of the lumbar spine, and positive straight leg raise (AR 390).

Moreover, Rowe's opinions are supported by her own treatment notes.  For example, Rowe repeatedly noted at office visits that Burdick had muscle pain and joint pain, particularly in the left shoulder and lower back.  (*See, e.g.*, AR 382, 385, 401, 404).  She continually listed as "Active Problems": complete tear of left rotator cuff tendon, lumbar disc degeneration, lumbar facet syndrome, and chronic pain syndrome.  (AR 382, 384, 401, 404, 421.)  Rowe stated in an August 2011 office note that Burdick had "continued low back pain" and appeared "chronically ill and . . . older than [his] stated age."  (AR 401, 402.)  In a November 2011 office note, Rowe again stated that Burdick appeared "chronically ill" and "older than [his] stated age," and had "muscle pain and joint pain."  (AR 422.)  Rowe's most detailed recordings of Burdick's condition are found in her December 2010 office note, where she recorded several signs and symptoms to support her opinions regarding Burdick's physical limitations, including: shoulder tenderness, painful movement and rotation of the left shoulder, positive Drop Arm test, positive Empty Can test, positive Lift Off test, loss of normal curvature of the spine, tenderness in the lumbar spine, bilateral muscle spasms in the spine, painful movement and rotation of the spine, and positive straight leg raise.  (AR 385.)  Rowe's subsequent office notes do not indicate that any of these conditions improved during her treatment of Burdick.  Also noteworthy, Burdick's treating physicians and other providers, including Rowe, prescribed a variety of medications for Burdick's pain, including

methylprednisolone, gabapentin, Zanaflex, Flexeril, trazodone, and tramadol.  (*See* AR 273, 383, 386–87, 390, 396, 402.)  The ALJ should have given more consideration to these medical records which support Rowe's opinions.[4]

The ALJ also should have considered that agency consultants Drs. Abramson and Fingar made their opinions regarding Burdick's physical RFC in November 2010 and April 2011, respectively, *before* NP Rowe made her November 2011 opinions.  (*See* AR 76, 92, 414, 420.)  The Second Circuit has held that, where it is unclear whether an agency consultant reviewed "all of [the plaintiff's] relevant medical information," the consultant's opinion is not supported by the evidence of record, as required to override the opinion of a treating physician.  *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011).  Although Rowe is not a physician, she is a valuable treating medical source, and the agency consultants did not review her opinions prior to preparing their reports.  The ALJ at least should have acknowledged this deficiency, noting its effect on the weight afforded to each medical opinion.

---

[4]  Also noteworthy, NP Rowe's opinions are supported by the observations of agency "Report Completer" Robert Anderson, who helped Burdick complete agency forms, and observed that: "[Burdick] is unable to sit for more than a few minutes.  He asks permission to stand because he states his back hurts more when he is sitting.  He is then unable to stand still but shifts his weight from side to side."  (AR 220.)  Similarly, the transcript of the administrative hearing documents that Burdick had to alternate standing and sitting during the hearing.  (AR 48.)

## Conclusion

For these reasons, I recommend that Burdick's motion (Doc. 13) be GRANTED, the Commissioner's motion (Doc. 18) be DENIED, and the matter be REMANDED for further proceedings and a new decision.

Dated at Burlington, in the District of Vermont, this 15th day of May, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).